## AFFIDAVIT

COMES NOW Special Agent Krista Shelton (hereafter "Affiant") of the Internal Revenue Service, Criminal Investigation ("IRS"), who is currently assigned to the St. Louis Field Office, being of lawful age and first duly sworn upon my oath, do depose and state as follows:

## INTRODUCTION

1.     Your Affiant is a Special Agent (SA) with IRS-CI and has served in this capacity since March 2010.   Your Affiant graduated from the Federal Law Enforcement Training Center (FLETC) in September 2010.   Training at FLETC consisted of the Criminal Investigative Training Program and Special Agent Basic Training.   Your Affiant's current duties as an IRS-CI Special Agent include conducting and participating in criminal investigations of violations of the Internal Revenue Code and related offenses.   Prior to being a Special Agent, your Affiant was a Revenue Agent in the Small Business / Self Employed Division of the Internal Revenue Service (IRS) for over three and a half years.   As a Revenue Agent, your Affiant conducted examinations of Federal Income Tax Returns to determine compliance with the Internal Revenue Code.   Your Affiant's formal education includes the receipt of a Bachelor of Science Degree in Management / Accounting from Park University in Parkville, Missouri.

2.     Your Affiant is investigating activities involving the use of three email accounts, listed on the respective Attachment A, that are believed to contain evidence relating to a fraud scheme involving the abuse of a federally-registered tax-exempt charitable organization, all in violation of 18 U.S.C. § 1343 and 26 U.S.C. §. 7212.   As will be shown below, there is probable cause to believe the email accounts referenced herein contain communications and documents relating to this wire fraud scheme to obtain money and property by means of fraudulent

representations, and in so doing personally diverted resources belonging to this federally-registered tax-exempt charitable organization, implicating violations of wire fraud (18 U.S.C. § 1343) and corruptly interfering with internal revenue laws (26 U.S.C. § 7212). Your Affiant is submitting this affidavit in support of search warrants authorizing a search of these email accounts, for the items specified in **Attachment B** ("Items to Be Seized") hereto, which constitute contraband, instrumentalities, and evidence of the foregoing violations.

      3.     This affidavit is in support of two separate search warrants for three email accounts, as described more fully in detail as follows:[1]

      a.     Information associated with **Google, Inc.** email account **vanderheg@gmail.com** and stored at premises controlled by **Google Inc., 1600 Amphitheatre Parkway, Mountain View, California 94043**.

      b.     Information associated with **Yahoo!, Inc.** email accounts **vacoxie@yahoo.com** and **mariamnjeri16@yahoo.com** stored at premises controlled by **Yahoo!, Inc., 701 First Avenue, Sunnyvale, California 94089**.

      4.     Based upon your Affiant's review of the evidence to date, and as set forth below, your Affiant believes the referenced email address contains items, more fully described in **Attachment B** (incorporated herein by reference), which constitute evidence, fruits, and instrumentalities of violations of the that are believed to contain evidence relating to a fraud scheme involving the abuse of a federally-registered tax-exempt charitable organization, in violation of 18 U.S.C. § 1343 and 26 U.S.C. § 7212, as well as the falsification of documents in a federal

---

1 Your Affiant is aware that previous search warrants - 16-SW-00323-REL & 16-SW-00324-REL – were sought and obtained for these accounts by DHS Special Agent Carlos Suarez in December 2016. However, subsequent to their signing, SA Suarez accepted employment at a different federal agency outside of Kansas City, Missouri, and the government became aware of the need to add additional authority relating to searches of email accounts that may be stored, in some portion, outside of the United States. (cf. Paragraph 63 and footnote 2).

investigation, in violation of 18 U.S.C. § 1519. Since this affidavit is being submitted for the limited purpose of securing a search warrant, your Affiant has not included each and every fact known to your Affiant concerning this investigation. Your Affiant's investigation has also been aided by many other special agents with IRS-CI and HSI, and their specific observations and knowledge as conveyed to your Affiant is noted where appropriate throughout this affidavit.

5. It is anticipated that the items sought by this warrant will be retrieved by law enforcement officers, as well as the respective corporate employees and provided to IRS-CI as authorized by Title 18, United States Code, Section 2703(g). A preservation letter for the **vanderheg@gmail.com** email account was sent to Google, Inc. on December 13, 2016, and a preservation letters for the **vacoxie@yahoo.com** and **mariamnjeri16@yahoo.com** email accounts was sent to Yahoo!, Inc. on December 13, 2016.

## BACKGROUND OF THE INVESTIGATION

6. THE SIXTH MAN FOUNDATION, which does business as PROJECT CONTACT AFRICA ("PCA") was created as a nonprofit corporation in the state of Oregon in 1984. This charity was founded by Kermit WASHINGTON ("WASHINGTON"), a former professional basketball player who played with various franchises of the National Basketball Association ("NBA") between 1973 and 1987. The original purpose for this charity was to "provide aid to Portland (community) Trailblazer fans." After he returned from a trip to war-torn Rwanda in the mid-1990's, WASHINGTON renamed this charity PROJECT CONTACT AFRICA, with a new mission to provide aid and support to HIV-positive children in Kenya. Upon its creation, this charity applied for and received a designation by the Internal Revenue Service as a tax exempt

3

organization pursuant to section 501(c)(3) of the Internal Revenue Code, and was assigned Federal Employee Identification Number 93-0857868.

7.      From 2005 through 2015, WASHINGTON was employed as a regional representative with the National Basketball Players Association ("NBPA"). WASHINGTON actively solicited money and items from the NBA and NBPA for PCA since the early 2000's through early 2015.

8.      HSI special agents learned that one of the targets of its large-scale software piracy investigation, Reza DAVACHI, was using the online presence of the PCA to sell millions of dollars of illicit, unauthorized, and counterfeit software and software components. On October 20, 2015, DAVACHI entered a plea of guilty relating to his fraudulent use of PCA in conjunction with "Individual F" (the identifier for WASHINGTON, who had not yet been charged at that time). *See United States v. Reza Washington*, Case No. 15-CR-00346-W-DGK (W.D.Mo. Oct. 20, 2015) (Plea Agreement, Doc. No. 15).

### Homeland Security Investigations Agents Interview WASHINGTON

9.      On March 3, 2015, HSI Kansas City special agents met with Kermit WASHINGTON regarding DAVACHI's involvement and use of PCA. WASHINGTON stated that DAVACHI was an old friend of his, whom helped him raise money for the charity. WASHINGTON told the HSI special agents he had no knowledge of DAVACHI's illegitimate sales on eBay, stating he believed the monthly deposits directly correlated with the sale of sports paraphernalia provided by WASHINGTON to DAVACHI. When questioned about the financial information relating to the charity's bank account, including what appeared to be numerous personal expenditures, WASHINGTON stated his accountant told him to draw a salary from the

4

charity, and ultimately claimed poor bookkeeping habits as the reason for the discrepancies. These expenditures included hotel stays in Hawaii and Las Vegas, dental and plastic surgery expenses, numerous restaurant bills, several large cash withdrawals, wire transfers to WASHINGTON's personal bank accounts, as well as other suspicious activity.

10.     HSI continued its investigation into WASHINGTON's PCA charity, and was joined in this investigation by special agents with IRS-CI in the fall of 2015. Eventually, an indictment was returned by a Grand Jury charging WASHINGTON with corruptly interfering with internal revenue laws, conspiring to commit wire fraud, falsification of records in a federal investigation, and aggravated identity theft. *See United States v. Kermit Washington*, Case No. 16-00171-CR-W-DGK (W.D.Mo. May 23, 2016). A superseding indictment was returned on February 22, 2017, adding PATRICIA HARRIS ("HARRIS") as a co-defendant to Count Three. *Id.* (Superseding Indictment, Doc. No. 40). This superseding indictment alleges, in part, WASHINGTON's extensive diversions of PCA funds towards his own personal use.

11.     In the course of this investigation, WASHINGTON advised special agents with the Department of Homeland Security ("DHS") that some portion of charity funds were used to support at least two families in Africa. Your Affiant has learned that one of these families is a young woman, identified herein as "V.L.," that appears to have had a personal and sexual relationship with WASHINGTON in recent years. Moreover, many of these representations made by WASHINGTON with government officials as to V.L.'s actual role, involvement with the charity appear to have been made falsely by WASHINGTON.

12.     In the course of this investigation, and in consultation with DHS special agents, your Affiant has learned that WASHINGTON has provided tens of thousands of dollars to V.L. in PCA

5

proceeds. These email communications between WASHINGTON and V.L. referenced herein were reviewed by your Affiant upon receiving the response to a previous email search warrant served by the Department of Homeland Security agents on Microsoft Corporation for WASHINGTON's gymjunkies@msn.com and kaw24@live.com email accounts.

## Review of Email Communications between WASHINGTON and V.L.

13. Your Affiant observed numerous communications between WASHINGTON and V.L. For example, on September 5, 2012, WASHINGTON used PCA's check card to pay $1,500 in PCA funds for a reservation with Paradise Island Vacations, the company that manages vacation packages for the Atlantis resort in the Bahamas. Five days later, V.L. sent WASHINGTON an email (from her **vacoxie@yahoo.com** email account) relating to the visa restrictions for travel to the Bahamas. Shortly thereafter, WASHINGTON cancelled this trip.

14. On or about January 31, 2013, V.L. (using her **vacoxie@yahoo.com** email account) sent a recent image of herself to WASHINGTON; he wrote back, "You look good keep it up." On February 5, 2013, V.L. (using her **vacoxie@yahoo.com** email account) sent another image of herself to WASHINGTON; he responded, "You are getting so slim again, you look great." Four days later, on February 9, 2013, V.L. (using her **vacoxie@yahoo.com** email account) sent another image of herself to WASHINGTON; he responded, "I love the pictures, you look great. You have lost so much weight," and "You look beautiful cant wait to see you, tried to call but no answer."

15. On or about May 29, 2013, V.L. (using her **vacoxie@yahoo.com** email account) sent WASHINGTON an email, writing:

> Hi, hope ur ok...Am told ur in Nairobi, I thought you will be coming on the 30 th. Am out of town but back in Nairobi tomorrow in the evening, so ii will see you on Friday. How long will you stay? Do u want someone to

6

spend some time with?  Call this number…she is [redacted] a very good friend of mine.

On that same date, WASHINGTON wrote back, "hope to see you before I leave."  Less than a week and a half later, WASHINGTON wired approximately $200 to V.L. via Western Union.

16.  On or about July 11, 2013, V.L. (using her **vacoxie@yahoo.com** email account) sent WASHINGTON an email asking that he help pay her rent for that month, and giving him the instructions for sending it via Western Union.  WASHINGTON writes back and tells her he will be visiting Africa at the end of the next month and misses her, and will see what he could do.  V.L. continues to email WASHINGTON asking for help paying her rent.  Eventually, V.L. uses her **vanderheg@gmail.com** email address to write WASHINGTON, writing, "Pls, use this email address I can't get access to the other account.  Thanks n looking forward to hear from you :-*"

17.  On July 15, 2013, WASHINGTON replies to V.L.'s **vanderheg@gmail.com** email address, writing "Im not at home in meetings. Sorry can not get it done till Wednesday…Give me your landlords cell I will call him."  The following day, July 16, 2013, WASHINGTON sends another response to V.L.'s **vanderheg@gmail.com** email address, writing "I can take care of it on Wednesday but not before."

18.  On July 17, 2013, V.L. (using her **vanderheg@gmail.com** email address), sent WASHINGTON an image of the two of them together with the website "WWW.DCCLUBBING.COM" watermarked at the bottom.  WASHINGTON replies to this **vanderheg@gmail.com** email address, writing, "I will take care of that today or tomorrow…Money to the same lady?" and "You look so young."

7

19.     On July 18 and 19, 2013, WASHINGTON writes a series of emails to V.L.'s **vanderheg@gmail.com** email address, informing her of the issues he has wiring money to her through Western Union and advising that he would have his daughter send her the money.

20.     On July 21, 2013, WASHINGTON sent an email to V.L.'s **vanderheg@gmail.com** email address, writing "The money should go through…I don't mean to ask but since I taking care of a lot of people. When do I think u can pay me back, if I had it and did not need it I would not ask?"   V.L., through her **vanderheg@gmail.com** email address, replied, "Thanks for the money…Once am back in kenya for sure I will send the money back to you."

21.     Your Affiant is aware that Western Union records reflect that on July 21, 2013, WASHINGTON's daughter (or someone using her name) wired approximately $1,231 to the attention of the third party individual identified by V.L. in these emails.

22.     On July 25, 2013, V.L. (using her **vanderheg@gmail.com** email address), sent WASHINGTON an email confirming the money was received and that she would find a way to pay him back.   WASHINGTON responds to V.L.'s **vanderheg@gmail.com** email address, writing "when r u coming back," and "Do u miss me?"   Weeks later, on August 15, 2013, WASHINGTON sent another email to V.L.'s **vanderheg@gmail.com** email account, asking, "When will u b in nairobi?"

23.     On August 18, 2013, V.L. (using her **vacoxie@yahoo.com** email account) sent an email to WASHINGTON informing him that she wouldn't be able to send the money as promised. WASHINGTON replies, "Im ok with it…Going to b in Kenya next week.   I wish u were going to b there. Is [redacted] in town. It would save me a lot of money not paying for hotel. I still think u

8

are my favorite miss u." A minute later, WASHINGTON sends V.L. another response to this account, writing "miss u."

24. On August 21, 2013, V.L. (using her **vacoxie@yahoo.com** email account) sent an email to WASHINGTON, asking how long he would be in Kenya. WASHINGTON replied, "I really miss u. As I said u were perfect for me exactly what I wanted."

25. On August 25, 2013, WASHINGTON replied to a July 17, 2013 email from V.L.'s **vanderheg@gmail.com** email address, writing, "Was looking at your picture, thinking about you."

26. On September 22, 2013, WASHINGTON replied an email from V.L.'s **vacoxie@yahoo.com** email address, writing,

> I have a guy who is writing a book of my life and other things that can make me money, I m sorry u r doing what u did before but I understand...U have responsibilities, if any of my things do well I will get a place in Nairobi. Please use protection I don't want u getting HIV...as I told u I really did love u. If I do well I will take care of u and I will know by January.

Shortly after sending this email, WASHINGTON sent another to V.L.'s **vacoxie@yahoo.com** email address, writing, "So if I come in dec u should just stay and see me if I can help u?"

27. On that same date, September 22, 2013, V.L. sent WASHINGTON another email (using her **vacoxie@yahoo.com** email address), writing,

> I know it will never be the same between us after I got my second baby... Though I still had hopes coz u always promised to come to kenya at some point but u kept on cancelling you went mute at times. I understand u had a girlfriend and I respected the fact that you can't be there for me like before...I feel so depressed am back to square one sleeping with men to get some money...We rarely speak open on phone like before. Am not writing you this mail expecting to get any help, pity or something from you but just to let u know what's going on in my life. I am very down n I feel alone not knowing my fate. Take care n God bless you always.

9

WASHINGTON replied, writing, "How old are u now?...i will call u tomorrow . When we were together u gave me everything I wanted and I really thought u loved me. It was a good time."

28.     On October 22 and 23, 2013, V.L. (using both her **vacoxie@yahoo.com** and **mariamnjeri16@yahoo.com** email addresses) sent WASHINGTON a series of emails containing nude images of herself.  On October 22, 2013, WASHINGTON replied, writing, "Thank you I love them. I m in love again. I like u happy and beautiful.

29.     On October 23, 2013, in response to one of these nude images, WASHINGTON replied, writing, "Put money in tomorrow."   On October 24, 2013, WASHINGTON send an email to V.L.'s **mariamnjeri16@yahoo.com** email addresses, writing "Thank u so much for pictures will put in money today and call u. Pictures are beautiful."   Your Affiant is aware that, on October 24, 2013, Western Union records reflect that WASHINGTON's daughter (or someone using her name) wired approximately $210.50 to V.L.   On that same date, WASHINGTON sent an email to V.L.'s **mariamnjeri16@yahoo.com** email addresses, writing "Money is in."

30.     Your Affiant is aware that Western Union records reflect that WASHINGTON's daughter (or someone using her name) would continue to wire money to V.L. through the end of 2014 on a near-monthly basis, totaling approximately $5,251.50 between October 2013 and December 2014.

31.     On December 6, 2013, V.L. (using her **vacoxie@yahoo.com** email address) sent WASHINGTON a clothed selfie.   WASHINGTON replied on that same date, writing, "Beautiful. Is that all for me ?(;"   V.L. sent a series of additional pictures to WASHINGTON, who replied, "Beautiful. Is that mine?" and "R u mine?"

10

32.     On December 13, 2013, V.L. (using her **vacoxie@yahoo.com** email address) sent WASHINGTON a video file of her masturbating, writing, "Hi, this is for you and your eyes only:) Hope u like it…"   On that same date, WASHINGTON replied, writing, "I love it. You are perfect for me. I want a women like you that will do the things I like and u love the video."

33.     On December 14, 2013, WASHINGTON again replies to this email from V.L.'s **vacoxie@yahoo.com** email address, writing "Can u send me [redacted] cell do I need to give her money? How r u doing? Love the video next time talk to me on it…Miss u and u are beautiful."

34.     On December 16, 2013, V.L. (using her **vacoxie@yahoo.com** email address) sent WASHINGTON an email, writing, "pls send [redacted] the money, I would really appreciate it…I took 275 $ fom her…Am glad you enjoyed my little porn movie:)) next time I will talk a little on the video n show more of my body ;) I was so horny and when almost about to come that's when I took the video:)."

35.     On December 18, 2013, V.L. (using her **vacoxie@yahoo.com** email address) sent WASHINGTON an email, writing, "Hey :)…Did you manage to send [redacted] the money?...When are you coming? Miss u:-*"   WASHINGTON replied, writing, "Will give her the money on Saturday, will b coming to africa in January or the early part of feb…And when I say I m coming I will be there."

36.     On December 22, 2013, V.L. (using her **vacoxie@yahoo.com** email address) sent WASHINGTON an email, writing, "Hi, did you manage to send [redacted] the money?" WASHINGTON replies, "Will send her western union number tomorrow  How r u ?"   The following day, on December 23, 2013, V.L. replies, writing "Am fine, hope ur fine too…[Redacted] is upset with me…I have disappointed her with money coz he was meant to use that money on

11

something before Christmas, and I promised her that u will send her the money in 10days after I left, as per what u told me :(" WASHINGTON replies, "I used my daughters name to send it," and that he had sent $280. Your Affiant is aware that Western Union records reflect approximately $290.50 (inclusive of fees) was wired on December 23, 2013, to this third-party individual specified in these emails. On December 23, 2013, V.L. advises WASHINGTON via email that she will confirm her receipt of the money, and WASHINGTON replies, "Love your pictures."

37.     On May 13, 2014, V.L. (using her **vacoxie@yahoo.com** email address) sent WASHINGTON an email containing the aforementioned picture of the two of them with the website address www.dcclubbing.com (c.f. Affidavit ¶ 19). WASHINGTON replied, writing, "That's when you loved me completely," and "I DO MISS THAT [V.L.]." On May 28, 2014, V.L. responded, "She is still the same [V.L.], it's just that life changed her." WASHINGTON replied the next day, writing, "I wish she would come back to me."

38.     On August 28, 2014, WASHINGTON wrote to V.L. at her **vanderheg@gmail.com** email address, writing, "I want you to go to the Kenyan embassy and get an application for a visa to the usa. Tell me what has to be done and I will help you get it. Kermit."

39.     On October 1, 2014, WASHINGTON sent an email to V.L. at her **vacoxie@yahoo.com** email address which contained a smiling picture of himself with the subject line, "Miss you." WASHINGTON followed this email by sending numerous other pictures of himself to V.L. On that same date, V.L. also sent a picture of herself to WASHINGTON, to which he replied, "Is that mine?...I will be coming later in month. But I am coming. I can't wait."

40.     On October 7, 2014, V.L. (using her **vacoxie@yahoo.com** email address) sent WASHINGTON an email containing an image zoomed in on a vagina. WASHINGTON replied

12

on that same date, writing, "Thank you that is beautiful, is that mine? I would want that everyday and every night." Less than three weeks later, Western Union records reflect that WASHINGTON's daughter (or someone using her name) wired $898.50 to V.L.

## WASHINGTON's Potential Obstruction and Witness Tampering in Communications with V.L. in June 2015

41.     Between June 10 and 13, 2015, after the initiation of this federal investigation and issuance of a Grand Jury subpoena to PCA, WASHINGTON and V.L. exchange various emails relating to his expenditures with PCA.   WASHINGTON was informed of this investigation in early March 2015, and met with government investigators in early June 2015.   Shortly thereafter, WASHINGTON appears to have communicated with V.L. (using her **vacoxie@yahoo.com** email address) to craft an alternate explanation for the extensive proceeds he sent her over time.

42.     For example, on June 10, 2015, in an email with the subject line "THANK YOU!," V.L. (using the **vacoxie@yahoo.com** email address) writes WASHINGTON an email thanking him for his extensive "kindness, generosity, support and encouragement" over the years, and that he had been a "truly God send and a blessing to me and my family."   This email discusses various financial support for medical needs WASHINGTON purportedly provided for V.L.'s family members, concluding that WASHINGTON ultimately paid $6,000 per year over six years for the school fees of her child.

43.     The next day, on June 11, 2015, WASHINGTON replies, "Very nice and thank you, do you have the bill from the school?   Will call tomorrow Kermit."   Two days later, on June 13, 2015, V.L. responds:

> Dear Mr. Washington
> The school fees total amount for [name of V.L.'s son] for the past 6 years is approximately 32,000$ in total…I really appreciate for your continuous support.

13

Yours faithfully,
[V.L.]

44.     Records and communications characterizing these payments as "school fees" were produced to the government by WASHINGTON on behalf of PCA in the course of the investigation. Notwithstanding the representations in these emails and documents, your Affiant did not observe any emails between WASHINGTON and V.L. prior to this date (and investigation) characterizing WASHINGTON and PCA's ongoing monetary support as going towards "school fees" or tuition.

### V.L. Questioned During Travel in February 2016

45.     Your Affiant is aware, based on consultation with special agents with the Department of Homeland Security and a review of reports generated from this investigation, that on February 16, 2016, V.L. traveled to New York City, NY.   Your Affiant is aware, that, upon her arrival in the United States, V.L. was questioned by an HSI agents relating to her purpose in traveling.   V.L. confirmed WASHINGTON had vouched for her previous visa application in 2009. During this interview, V.L. advised that she had minimal involvement with PCA, that her current level of involvement was "none," and that it was limited to "a few months in 2008 is all I did." V.L. confirmed in writing that she used the following email addresses to communicate with WASHINGTON:        **vacoxie@yahoo.com**,        **mariamnjeri16@yahoo.com**,        and **vanderheg@gmail.com**.   V.L. advised that WASHINGTON has provided her continual monetary support for her and her children since approximately 2008, totaling approximately $25,000 to $30,000.

46.     V.L. further admitted to having a romantic and sexual relationship with WASHINGTON when she visited him in 2009 and when he visited her on his trips to Kenya over

14

the years, most recently in 2015. V.L. denied that she engaged in prostitution activity with WASHINGTON, but that she had "introduced Kermit to friends but don't know if they got paid."

47.     Your Affiant is also aware that, on December 10, 2016, at approximately 1315 HRS, V.L. arrived in Los Angeles International Airport.   Upon entry, V.L. apparently advised HSI agents that during her visit she intended to meet with her "boss," who she identified as WASHINGTON. This statement is inconsistent with her previous statements upon entry in February 2016 (where she attested that she worked for a marketing firm in Nairobi) and the records provided by WASHINGTON and PCA which reflect no formalized employment relationship between WASHINGTON, PCA, and V.L.

48.     Further, the timing of this sudden visit is suspicious, coming within weeks of WASHINGTON being provided reports and transcripts relating to the evidence developed in the course of this investigation (and reflected herein) relating to these apparent diversions to V.L.

## LEGAL AUTHORITY

49.     The legal authority for this search warrant application is derived from 18 U.S.C. §§ 2701-11, entitled, stored wire and electronic communications and transactional records access.

50.     Title 18, United States Code, Section 2703(c)(A) allows for nationwide service of process of search warrants for the contents of electronic communications.   Pursuant to 18 U.S.C. § 2703, as amended by the USA PATRIOT Act, Section 220, a government entity may require a provider of an electronic communication service or a remote computing service to disclose a record or other information pertaining to a subscriber or customer of such service pursuant to a warrant issued using procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation.   This Court has jurisdiction to issue the requested

15

warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C.

§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the court is "a district court of the United States . .

. that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(I).

51.    Title 18, United States Code, Section § 2703 further states in part:

(a) Contents of Wire or Electronic Communications in Electronic Storage. A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communication system for more than one hundred and eighty days by the means available under subsection (b) of this section.

(b) Contents of Wire or Electronic Communications in a Remote Computing Service. (1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection. (A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant....

52.    Title 18, United States Code, Section 2703(c)(2) adds that a provider of an electronic

communication service or remote computer service must also provide, without notice to the

customer, the name, address, connection records, length of service, and means of payment pursuant

to a search warrant.

16

## INFORMATION AVAILABLE FROM INTERNET-BASED EMAIL SERVICE PROVIDERS

53.     In your Affiant's training and experience, your Affiant has learned that companies that offer email service such as AOL, Google, Microsoft, Yahoo!, and GoDaddy and others referenced herein ("email service providers") provide a variety of on-line services, including electronic mail ("email") access, to the general public.   These email service providers allow subscribers to obtain email accounts at the company's own domain names (such as aol.com (AOL Inc.), google.com (Google, Inc.), and msn.com (Microsoft Corporation), yahoo.com (Yahoo!, Inc.). Subscribers obtain an account by registering with those respective companies.   During the registration process, these email service providers ask subscribers to provide basic personal information.   Therefore, the computers of these companies are likely to contain stored electronic communications (including retrieved and unretrieved email for the email subscribers) and information concerning subscribers and their use of these email provider's services, such as account access information, email transaction information, and account application information.

54.     In general, an email that is sent to an email service provider's subscriber is stored in the subscriber's "mail box" on those companies' respective servers until the subscriber deletes the email.   If the subscriber does not delete the message, the message can remain on those companies' respective servers indefinitely.

55.     When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to the email service provider's servers, and then transmitted to its end destination. These companies often save a copy of the email sent.   Unless the sender of the email specifically deletes the email from the company's server, the email can remain on the system indefinitely.

17

56.     Sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email.    If an email user writes a draft message but does not send it, that message may also be saved by the email service provider but may not include all of these categories of data.

57.     A subscriber can also store files, including emails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned the respective company.

58.     Subscribers to these email service providers might not store on their home computers copies of the emails stored in their respective accounts.    This is particularly true when they access their accounts through the web, or if they do not wish to maintain particular emails or files in their residence.

59.     In general, email service providers ask each of their subscribers to provide certain personal identifying information when registering for an email account.    This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

60.     Email service providers typically retain certain transactional information about the creation and use of each account on their systems.    This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the various websites), and other log files that reflect usage of the account.    In addition, email providers often

18

have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

61. In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

62. In your Affiant's training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

63. This application seeks a warrant to search all responsive records and information under the control of the email accounts maintained and/or controlled by **Google, Inc.** or **Yahoo!, Inc.**, providers subject to the jurisdiction of this court, regardless of where **Google, Inc.** or **Yahoo!, Inc.** has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within **Google, Inc.** or **Yahoo!, Inc.'s** possession, custody, or

19

control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.[2]

## REQUEST FOR SEALING

64.     It is respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice.   Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation and premature disclosure of the contents of this affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

---

[2]It is possible that **Google, Inc.** or **Yahoo!, Inc.** store some portion of the information sought outside of the United States.   In Microsoft Corp. v. United States, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information— including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of **Google, Inc.** or **Yahoo!, Inc.** The government also seeks the disclosure of the physical location or locations where the information is stored.

20

## CONCLUSION

65.     Based upon the above information, your Affiant asserts that probable cause exists to believe there has been a violation of (18 U.S.C. § 1343), which prohibits the use of electronic communications to commit fraud, corrupting interfering with internal revenue laws, (26 U.S.C. § 7212), and the falsification of documents in a federal investigation (18 U.S.C. § 1519), and that evidence of those violations exist and are located within the identified email accounts.

**FURTHER AFFIANT SAYETH NOT.**

Krista Shelton, Special Agent
Internal Revenue Service

Subscribed and sworn before
me this __22__ day of March, 2017.

HONORABLE ROBERT E. LARSEN
UNITED STATES MAGISTRATE JUDGE

21